FILED

12/18/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2020

## IN RE TAVARIUS M. ET AL.

**Appeal from the Juvenile Court for Williamson County**
**Nos. 31917; 36264        Sharon Guffee, Judge**

_____

### No. M2020-00071-COA-R3-PT

_____

Darius M. ("Father M.") and Denzel W. ("Father W.") appeal the juvenile court's decision to terminate their parental rights. They also challenge the juvenile court's finding by clear and convincing evidence that termination of their parental rights was in the best interest of the children. Because the juvenile court erred in allowing Father W.'s attorney to withdraw from representation on the first day of trial, we vacate the court's termination of his parental rights on all grounds and remand for a new trial. We affirm the juvenile court's termination of Father M.'s parental rights.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in part, Affirmed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE, and KRISTI M. DAVIS, JJ., joined.

Matthew R. Muenzen, Franklin, Tennessee, for the appellant, Darius M.

David Mitchell Jones, Franklin, Tennessee, for the appellant, Denzel W.

Herbert H. Slatery, III, Attorney General and Reporter, and Matthew Daniel Cloutier, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Tavarius was born in 2010 to Talisa P. ("Mother") and Father M., and Karlin was born in 2011 to Mother and Father W. In February 2017, the Tennessee Department of Children's Services ("DCS" or "the Department") received a referral alleging educational

neglect by Mother. The Department investigated the allegations in the referral and learned that both children had truancy problems because Mother was struggling to get them to school daily and/or on time. After DCS began assisting Mother, the children's truancy problems improved. The case remained open, however, to ensure continued school compliance. Prior to a hearing on March 30, 2017, DCS received a report that Mother had substance abuse issues. Mother submitted to a drug screen and tested positive for marijuana and cocaine.

The following week, Mother went to the DCS office and requested that the children be placed in foster care. Because of a restraining order based upon domestic violence concerns, the children could not be placed with Father W. Father M. also was not a placement option because he was incarcerated for aggravated kidnapping. The aggravated kidnapping conviction resulted from an incident with Mother in 2014 where Father M., while under the influence of an illegal substance, locked Mother in a room for five hours, broke her jaw, and caused her lasting head trauma. Father M. pled guilty and was sentenced to eight years imprisonment, which he began serving in November 2010.

On April 7, 2017, DCS filed a petition for dependency and neglect. After hearing the petition, the juvenile court entered orders on April 11, 2017, finding that there was probable cause to believe that the children were dependent and neglected and placing them in the Department's custody. Approximately two years later, on July 8, 2019, DCS filed a petition to terminate the parental rights of Father M. and Father W.

The juvenile court heard the termination petition on October 30 and November 6, 2019. When Father W. failed to appear on the first day of trial, his attorney made an oral motion to withdraw because Father W. had not maintained contact with him and had not followed the attorney's counsel and advice. The following exchange occurred between Father W.'s attorney and the trial judge:

THE COURT: Any preliminary matters?
[COUNSEL]: Your Honor, I - - if I may, I have not been able to be in touch with my client since we were last here September 21st. I have gone through roughly 2,000 pages of discovery. I have reached out to him multiple times. Obviously to protect my client, I would ask that we continue this so that he could be present and assist me in assisting him. If Your Honor would not entertain that, then I would make a motion - - an oral motion to withdraw simply because he's failed to maintain effective communication with me, he's failed to follow the effective advice of counsel, and I feel like our attorney-client relationship is irretrievably broken. As such, I would move the Court to entertain that also.
THE COURT: All right. [Counsel], I will respectfully deny your motion to continue, but I will grant your motion to withdraw. Thank you.
[COUNSEL]: I appreciate it, Your Honor.

THE COURT:  He had notice to be here.  Any other preliminary matters?

After granting the motion to withdraw, the court proceeded with the first day of trial.  Father W. appeared on the second day of trial and made an oral motion for a continuance in order to secure new counsel.  The juvenile court denied his motion and proceeded with the second day of trial with Father W. acting pro se.

After the trial concluded, the court entered an order terminating Father W.'s and Father M.'s parental rights.[1]  The court determined that the following grounds had been proven by clear and convincing evidence as to Father W.:  (1) abandonment by failure to visit, (2) substantial noncompliance with the permanency plans, and (3) failure to manifest an ability and willingness to assume custody.  With regard to Father M., the court determined that the following grounds had been proven by clear and convincing evidence: (1) abandonment by exhibiting a wanton disregard and (2) failure to manifest an ability and willingness to assume custody.  Finally, the court determined that there was clear and convincing evidence that termination of Father W.'s and Father M.'s parental rights was in the best interest of the children.

Both fathers appealed and present the following issues:  whether the juvenile court erred in finding by clear and convincing evidence that grounds existed to terminate their parental rights, and whether the juvenile court erred in determining that termination of their parental rights was in the best interest of the children.  Father W. raises the additional issue of whether the juvenile court erred in permitting his attorney to withdraw on the first day of trial.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child.  *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)).  Although this right is fundamental, it is not absolute and may be terminated in certain situations.  *In re Angela E.*, 303 S.W.3d at 250.  Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'"  *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights.  First, a petitioner seeking to terminate parental rights must

---

[1] The juvenile court also terminated Mother's parental rights, but she did not appeal.

prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a "heightened standard of proof—clear and convincing evidence." *In re Carrington H.*, 483 S.W.3d at 522; *see* Tenn. Code Ann. § 36-1-113(c)(1). Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

ANALYSIS

I. Assistance of Counsel for Father W.

Father W. first argues that the manner in which the juvenile court permitted his appointed trial court counsel to withdraw violated his due process right to a fundamentally fair proceeding. Although the Due Process Clause of the United States Constitution does not "require[] the appointment of counsel in every parental termination proceeding[,]" *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31 (1981), "Tennessee statutorily provides the right to appointed counsel for indigent parents in every parental

termination proceeding," *In re Carrington H.*, 483 S.W.3d at 527; *see also* Tenn. Code Ann. § 37-1-126(a)(2)(B)(ii) ("A parent is entitled to representation by legal counsel at all stages of any proceeding under this part in proceedings involving . . . [t]ermination of parental rights pursuant to § 36-1-113."). A parent's right to appointed counsel in parental termination proceedings is not absolute, however. This Court has recognized that a parent may effectively waive the right to appointed counsel if the parent fails "to assist his counsel or communicate with her at all in the two months before the [parental termination] hearing." *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at *6 (Tenn. Ct. App. Dec. 29, 2010).

"An attorney appointed by the juvenile court for an indigent party in a parental termination case must seek leave of the court to withdraw." *In re Jamie B.*, No. M2016-01589-COA-R3-PT, 2017 WL 2829855, at *5 (Tenn. Ct. App. June 30, 2017) (citing TENN. SUP. CT. R. 13, Sec. 1(e)(5)). The decision to grant or deny a motion to withdraw is a matter that falls within the juvenile court's discretion. *Id.* Thus, we review such determinations under an abuse of discretion standard. *Id.* An abuse of discretion occurs when a court "causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

When considering a request for leave to withdraw from representation and when determining whether a parent has effectively waived his or her right to counsel, a court must "'consider the principles embodied in the [Tennessee] Rules of Professional Conduct.'" *In re A.P.*, No. M2017-00289-COA-R3-PT, 2019 WL 1422927, at *4 (Tenn. Ct. App. Mar. 29, 2019) (quoting *In re Jamie B.*, 2017 WL 2829855, at *5). The Rules of Professional Conduct permit a lawyer to withdraw from representing a client in several situations. *See* TENN. SUP. CT. R. 8, Rule 1.16(b). Pertinent to this case, the Rules of Professional Conduct permit a lawyer to withdraw when "the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled" or when "the representation . . . has been rendered unreasonably difficult by the client." TENN. SUP. CT. R. 8, Rule 1.16(b)(5), (6). "[A] failure to communicate and the failure to appear for trial can render a representation unreasonably difficult," *In re Jamie B.*, 2017 WL 2829855, at *6, and "can serve as a basis for withdrawal of representation under Rule 1.16," *In re A.P.*, 2019 WL 1422927, at *5; *see also State Dep't of Children's Servs. v. Agbigor, Sr.*, No. M2000-03214-COA-R3-JV, 2002 WL 31528509, at *5-6 (Tenn. Ct. App. Nov. 15, 2002).

Here, the juvenile court permitted Father W.'s trial counsel to withdraw and declined to appoint new counsel for him because Father W. failed to appear in court on the first day of trial despite having notice. We must determine whether the record is sufficient to show that Father W. effectively waived his right to counsel and whether the juvenile

court followed the proper procedure in permitting the withdrawal. This Court has previously addressed this issue in situations similar to the one here. In *In re Elijah B.*, 2010 WL 5549229, at *5, the father failed to appear at the parental termination hearing despite being notified of the hearing's date. When the father failed to appear, his attorney informed the court that she had not been able to contact him for about six weeks and then made an oral motion to withdraw. *Id.* at *4. The trial court permitted the lawyer to withdraw and proceeded with the termination hearing. *Id.* At the conclusion of the hearing, the trial court terminated the father's parental rights. *Id.*

On appeal, the father asserted that he was denied due process because he did not receive proper notice of the termination hearing and because his attorney was permitted to withdraw at the hearing. *Id.* at *5. We concluded that the father had not been denied due process because he conceded to knowing the date of the termination hearing in advance due to attending a previous hearing during which the termination hearing was rescheduled. *Id.* Moreover, we noted that the father failed to "offer any real reason for his absence at the [termination] hearing" or to "address his failure to contact or communicate with his counsel." *Id.* at *6. As a result, we concluded that the father "effectively waived his right to appointed counsel by failing to assist his counsel or communicate with her at all in the two months before the hearing." *Id.*

We again considered whether a parent waived the right to counsel in *In re Jamie B.*, 2017 WL 2829855, at *5-6, and we reached a different conclusion than in *In re Elijah B.* In *In re Jamie B.*, the mother was not present in court when the termination hearing began, and her attorney made an oral motion to withdraw because he had not been able to contact her. *In re Jamie B.*, 2017 WL 2829855, at *1-2. The trial court permitted the attorney to withdraw without inquiring about what efforts the attorney had made to communicate with the mother. *Id.* at *2. Shortly after the first witness began testifying, the mother arrived and informed the court that she did not want to give up her parental rights and wanted an attorney. *Id.* at *2-3. The attorney who had recently been permitted to withdraw was still in the court room, and he had a brief conference with the mother. *Id.* at *3. After speaking with the mother, the attorney stated that he was "not prepared" and still wished to withdraw. *Id.* The court permitted the withdrawal and proceeded with the termination hearing with the mother pro se. At the conclusion of the trial, the mother's parental rights were terminated. *Id.* at *3-4.

On appeal, the mother asserted that the trial court erred in permitting her attorney to withdraw on the day of the termination hearing. *Id.* at *4. We agreed, concluding that the record did not contain sufficient evidence to establish that the mother had waived her right to counsel by failing to fulfill an obligation she owed to the attorney. *Id.* at *6. In reaching this decision, we found it particularly important that "[t]he information provided by counsel regarding his efforts to communicate with his client was limited as was the court's questioning" and that counsel had not established "that he had provided suitable notice that he would withdraw if Mother failed to satisfy [her] obligations [to him]." *Id.* Therefore,

- 6 -

we vacated the trial court's order terminating the mother's rights and remanded the case for a new trial. *Id.*

We recently considered the issue again in *In re A.P.*, 2019 WL 1422927, at *5-6. In that case, the mother's attorney filed a written motion to withdraw on the morning of the termination hearing contending that the mother "had failed to stay in contact with [him] and the attorney-client relationship was thereby broken." *In re A.P.*, 2019 WL 1422927, at *1. The certificate of service attached to the motion did not include the mother's name and address. *Id.* The mother failed to appear at the termination hearing, and the trial court permitted the attorney to withdraw. *Id.* at *1-2. Prior to allowing the withdrawal, the court briefly inquired about the attorney's communications with the mother. *Id.* The attorney responded that he had communicated with the mother via email approximately three months before the termination hearing. *Id.* at *1. The trial court permitted the attorney to withdraw and then proceeded with the termination hearing. *Id.* at *2. The mother's parental rights were terminated. *Id.*

On appeal, the mother argued that the manner in which the trial court permitted her attorney to withdraw violated her due process right to a fundamentally fair proceeding because she had not received notice of the termination hearing or of her attorney's intent to withdraw the day of the hearing. *Id.* We perceived the facts of the case to be distinguishable from those in *In re Elijah B.* because the record lacked evidence showing that the mother had received proper notice of the termination hearing and because the mother "sharply dispute[d] that she was informed of the hearing date." *Id.* at *5. Moreover, because there was no evidence supporting the attorney's allegations of a lack of communication, we were reluctant to conclude that the mother had effectively waived her right to counsel. *Id.* The court in *In re A.P.* was further concerned that the record contained no evidence that the mother's attorney provided her with any prior warning that he planned to withdraw from representing her on the morning of the hearing. *Id.* at *6. We noted that, "[w]hile the trial court briefly questioned [the attorney] about the last time he had contact with his client, at no point did the trial court attempt to discern whether Mother was aware of [the attorney's] intent to withdraw from his representation." *Id.* "As such, the trial court's inquiry into the [attorney's] actions can only be described as 'limited' at best." *Id.* (quoting *In re Jamie B.*, 2017 WL 2829855, at *6). Thus, we perceived that the facts of the case were analogous to those in *In re Jamie B.* and concluded that the record did not support a finding that the mother had waived her right to counsel. *Id.*

In the present case, Father W., like the father in *In re Elijah B.*, concedes that he had notice of the termination hearing, but the facts here are distinguishable from the facts in that case. Unlike in *In re Elijah B.*, Father W. offered a reason for his absence on the first day of trial. On the second day of trial, Father W. appeared and explained his absence to the court as follows:

As of the court date of the 30th, I had - - I had it wrong, and I - - I had showed up on the 31st at 9 o'clock. And that's when I filed - - that's when I had to come back and do that motion, because I - - I had - - I had the court date wrong.

The record contains some support for Father W.'s claim that he did not appear because he had the wrong date. Specifically, the record contains a pro se motion filed by Father W. on November 1, 2019, requesting a continuance of thirty days so he could obtain new counsel. This is the motion Father W. mentioned in his explanation to the juvenile court. Thus, unlike in *In re Elijah B.*, it is not clear that Father W. simply chose not to appear on the first day of trial. Further, similar to *In re Jamie B.* and *In re A.P.*, the record contains no evidence supporting Father W.'s attorney's allegations that he was unable to communicate with his client because the juvenile court made no inquiry about the attorney's efforts to communicate with Father W. In fact, while explaining his absence on the first day of trial, Father W. indicated that his attorney had not communicated with him: "I have no legal counsel, and he - - he gave me no notice. He has my phone number; he has my home address and my email." In light of this proof, we are hesitant to conclude that his "failure to appear coupled with [his attorney's] unsupported allegations of lack of communication are sufficient to show that [he] effectively waived [his] statutory right to appointed counsel." *In re A.P.*, 2019 WL 1422927, at *5.

As in *In re Jamie B.* and *In re A.P.*, we are concerned that the record contains nothing indicating whether counsel "provided [Father W.] any prior warning that he might withdraw." *In re Jamie B.*, 2017 WL 2829855, at *6; *see also In re A.P.*, 2019 WL 1422927, at *6. In addition to failing to inquire about the attorney's efforts to communicate with Father W., the juvenile court made no attempt to discern whether Father W. knew of the attorney's intent to withdraw as counsel. Thus, the juvenile court's inquiry into the attorney's actions, unlike those in *In re Jamie B.* and *In re A.P.*, does not even rise to the level of "'limited' at best." *In re A.P.*, 2019 WL 1422927, at *6 (quoting *In re Jamie B.*, 2017 WL 2829855, at *6). Under these circumstances, we cannot conclude that the record supports a finding that Father W. waived his right to appointed counsel. We, therefore, vacate the judgment of the juvenile court to the extent it terminated the parental rights of Father W., and the case against Father W. is remanded for a new trial.[2]

---

[2] We acknowledge that our Supreme Court has directed us to review a trial court's findings regarding each ground for termination and whether termination of a parent's rights is in the best interest of a child. *In re Carrington H.*, 483 S.W.3d at 525. In *In re Jamie B.*, we noted this directive but vacated the trial court's termination of the mother's parental rights without reviewing the trial court's findings as to the grounds for termination. *In re Jamie B.*, 2017 WL 2829855, at *7; *see also In re A.P.*, 2019 WL 1422927, at *6-7. We explained as follows:

We are mindful of our supreme court's direction that we review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests. *In re Carrington H.*, 483 S.W.3d at 525. This serves to prevent "unnecessary remands of cases" and the important goal of speedily resolving parental termination

- 8 -

II.  Termination of Father M.'s Parental Rights.

    A.  Grounds for Termination.

        1.  Wanton Disregard.

A parent's rights may be terminated for abandoning his or her child.  Tenn. Code Ann. § 36-1-113(g)(1).  Tennessee Code Annotated section 36-1-102(1)(A) provides five alternative definitions of "abandonment," but only the definition provided in subsection (iv) is relevant in this case.  Under that definition, "abandonment" occurs when "a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action," and the parent "[h]as engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child."  Tenn. Code Ann. § 36-102(1)(A)(iv)(c).

The statute does not define "wanton disregard," but "[t]he actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child."  *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).  For instance, "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child."  *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).  We have explained that "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child," but "incarceration alone [is not] a ground for termination of parental rights."  *Id.* at 866.  Rather,

> the parent's incarceration serves only as a triggering mechanism that allows
> the court to take a closer look at the child's situation to determine whether
> the parental behavior that resulted in incarceration is part of a broader pattern

---

cases. *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). However, parents are also entitled to fundamentally fair procedures in termination proceedings. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky v. Kramer*, 455 U.S. 745, 754 (1982)). Given that we have determined Mother was denied these fundamentally fair procedures, we find it inappropriate to review findings based on evidence that went largely unchallenged by Mother and which was offered at a hearing during which Mother did not have the benefit of counsel. "[U]ltimate rights should be decided only when the court is 'in possession of the materials necessary to enable it to do full and complete justice between the parties.'" *Interstate Transit, Inc. v. City of Detroit*, 46 F.2d 42, 43 (6th Cir. 1931) (quoting *Eagle Glass & Mfg. Co. v. Rowe*, 245 U.S. 275, 280 (1917))."

*In re Jamie B.*, 2017 WL 2829855, at *7.

of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*Id.* Although "a parent's criminal behavior does not automatically constitute wanton disregard," "the severity and frequency of the criminal acts" are factors courts consider. *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014). When determining whether a parent's conduct constitutes "wanton disregard," a court is not limited to considering only acts that occurred during the four months immediately preceding the parent's incarceration. *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009). A court may consider conduct that occurred "at any time prior to incarceration." *Id.*

Here, the Department filed the petition to terminate Father M.'s parental rights on July 8, 2019. Father M. was incarcerated during all of the four months prior to the filing of the petition because he began serving an eight-year prison sentence for aggravated kidnapping in November 2014. Thus, DCS established the first requirement of this ground for termination.

In finding that Father M.'s pre-incarceration conduct constituted a wanton disregard for his child's welfare, the juvenile court first considered his actions in 2014 that served as the basis for the aggravated kidnapping conviction. Mother testified that, on the night of the incident, she and Father M. were under the influence of illegal drugs. He "held her hostage" for five hours, broke her jaw, and inflicted lasting head trauma. While Father M. did these things to Mother, Tavarius was asleep in the next room.

The juvenile court then considered Father M.'s other pre-incarceration conduct, which included additional convictions for resisting arrest, driving on a revoked license, and simple possession of cocaine. Due to these additional convictions, Father M. served two consecutive one-year sentences before he was incarcerated for aggravated kidnapping in 2014. After serving the consecutive sentences, Father M. was out of prison for only six months when he was re-incarcerated for aggravated kidnapping. Sadly, Father M.'s repeated criminal behavior has resulted in his incarceration for all but two years of Tavarius's life. Based upon the "severity and frequency" of Father M.'s pre-incarceration criminal behavior, we agree with the juvenile court's determination that he exhibited a wanton disregard for his child's welfare. The juvenile court did not err in terminating Father M.'s parental rights based on this ground.

### 2. Failure to Manifest an Ability and Willingness to Assume Custody.

Finally, the juvenile court found that DCS proved by clear and convincing evidence that Father M.'s parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(14). A court may terminate a parent's rights based on this ground if the parent

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, a party must prove that placing the child in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

Father M. concedes that DCS proved he failed to manifest an ability to assume custody of his child because he has been incarcerated since November 2010 and will not be released from prison before 2021. He argues that the trial court erred in terminating his rights pursuant to this ground, however, because the proof showed that he manifested a willingness to assume custody of his child. Father M. relies on *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044 (Tenn. Ct. App. May 31, 2018) to support his argument. In that case, a panel of this Court interpreted the conjunction "and" in Tenn. Code Ann. § 36-1-113(g)(14) to require a party to prove that a parent failed to exhibit both an inability and an unwillingness to assume custody or financial responsibility of a child. *In re Ayden S.*, 2018 WL 2447044, at *7. Under this interpretation, if a party proves only an inability or only an unwillingness, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights. *Id.* Our Supreme Court recently overruled *In re Ayden S.*, however, and adopted the holding in *In re Amynn K.* that section 36-1-113(g)(14) requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020), __ S.W.3d __ (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13-14). Thus, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, 2018 WL 3058280, at *13). Because DCS proved by clear and convincing evidence that Father M. failed to manifest an ability to assume custody of his child due to Father M.'s incarceration, the first prong of the statute is satisfied.

Regarding the second prong, we conclude that placing the child in the custody of Father M. "would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). "Substantial harm" requires "'a real hazard or danger that is not minor, trivial, or insignificant'" and, "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe

- 11 -

that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). Given the prior violent relationship between Father M. and Mother, placing Tavarius with Father M. poses a substantial risk that the child will be exposed to domestic violence. Moreover, Father M.'s extensive criminal history creates a substantial risk that the child would be exposed to illegal conduct.

For the aforementioned reasons, we conclude that the juvenile court did not err in concluding that DCS proved this ground by clear and convincing evidence.

B. Best Interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Father M.'s parental rights, we must next consider whether the juvenile court properly determined that termination of Father M.'s parental rights is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court must consider the nine factors enumerated in Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

After considering all of the evidence in light of the best interest factors, the juvenile court found that the factors favored terminating Father M.'s parental rights. *See* Tenn. Code Ann. § 36-1-113(i). The evidence in the record before us does not preponderate against the juvenile court's findings of fact.

The first best interest factor considers whether a parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). Father W. maintained that he was "a changed man" because "[t]his situation [the 8-year prison sentence] has opened my eyes. No way I'm coming back [to prison]." As the juvenile court found, however, Father M. "has not made an adjustment of his circumstances or conditions" because he continues to serve "an eight-year prison sentence for aggravated kidnapping against Mother" and "will not be released until sometime in 2021." Thus, any determination regarding whether he is "changed man" and has truly made an adjustment of circumstance must wait until he is out of prison and has an opportunity to show that he has changed. *See In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *7 (Tenn. Ct. App. Oct. 26, 2018) (affirming the trial court's finding that this factor favored termination because a determination of whether the father had made an adjustment of his circumstance would have to wait until he was out of prison).

The second best interest factor focuses on a parent's potential for long-lasting change by examining "whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2). As with the first factor, whether Father M. can effect a lasting adjustment of circumstance remains unclear until he is out of prison and has a chance to demonstrate any changes.

Father M. asserts that this factor does not favor terminating his parental rights because DCS did not make any effort to assist him in reuniting him with this child. We respectfully disagree. The Department acknowledged that it did not provide Father M. with any services because he was in prison. The Department did, however, develop a permanency plan with tasks for Father M. to complete. A DCS caseworker went to the prison and met with Father M. four times and, during at least one of those visits, the caseworker discussed the plan with him and explained that the Department would have a child and family team meeting with Father M. upon his release from prison to develop appropriate tasks related to his drug abuse and other concerns. Under this set of circumstances, the Department's efforts were reasonable.

Next, the juvenile court considered Father M.'s efforts to visit or contact Tavarius. *See* Tenn. Code Ann. § 36-1-113(i)(3) ("Whether the parent . . . has maintained regular visitation or other contact with the child"). From the date Father M. was incarcerated in 2014 through 2015, Father M.'s mother brought Tavarius to the prison once a month to visit with Father M., but he has had no visits with his son since 2015. We note that Father M. informed DCS at some point after Tavarius entered DCS custody in 2017 that he wanted visits with his son. As the juvenile court found, however, Father M.'s incarceration presented a barrier for visitation with the child. Specifically, his lengthy prison sentence

had resulted in his having had no contact with his son since 2015, a fact which DCS noted to be a concern and resulted in the Department's decision not to arrange any visits.

Father M.'s lack of contact with Tavarius for such a long period of time adversely affected his relationship with his son. *See* Tenn. Code Ann. § 36-1-113(i)(4) ("Whether a meaningful relationship has otherwise been established between the parent . . . and the child"). According to Father M., he had a great relationship with his son. The record does not preponderate against the juvenile court's finding, however, that "it [is] impossible to have much of a relationship when you are incarcerated for over half a child's young life." As we have already discussed, Father M. has been incarcerated for all but two years of Tavarius's life.

The fifth best interest factor considers "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). At the time of trial, Tavarius had been in his current foster home for approximately a year and a half. The evidence showed he was thriving in the foster home. Tavarius began excelling in school, no longer exhibited any behavioral problems, and no longer required regular counseling. Although Tavarius and Karlin were not placed in the same foster home, Tavarius's foster parents made certain that he visited his brother frequently. His foster parents think of him as their own child and want to adopt him if Tavarius becomes available for adoption. Conversely, Tavarius has little to no relationship with Father M., and Father M. does not currently have the ability to care for his son because he is incarcerated. Thus, as the juvenile court found, "[i]t would be emotionally devastating to change [Tavarius's] environment in any way."

The sixth factor asks whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or someone else in the child's household. Tenn. Code Ann. § 36-1-113(i)(6). The evidence does not preponderate against the juvenile court's finding that there was domestic violence between Father M. and Mother. Father M. is currently serving an eight-year prison sentence for aggravated kidnapping as the result of an incident where he kidnapped Mother and broke her jaw while his son was in the next room.

Under the seventh factor, a court considers a parent's home environment. *See* Tenn. Code Ann. § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home . . . ."). Father M. cannot provide a safe home for his son while he is incarcerated, and he will remain incarcerated until at least 2021. Moreover, Father M. has an extensive history of criminal activity.

As for factor eight, the record contains no evidence of Father M.'s mental or emotional status. *See* Tenn. Code Ann. § 36-1-113(i)(8) ("Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child."). Finally, as the

juvenile court noted, Father M.'s "incarceration has impeded his ability to pay child support." *See* Tenn. Code Ann. § 36-1-113(i)(9) ("Whether the parent . . . has paid child support consistent with the child support guidelines").

After considering the entire record, we conclude that the combined weight of the proof establishes by clear and convincing evidence that termination of Father M.'s parental rights was in Tavarius's best interest.

CONCLUSION

We reverse the juvenile court's termination of Father W.'s parental rights and remand for a new trial. We affirm the juvenile court's termination of Father M.'s parental rights on both grounds and affirm the juvenile court's conclusion that termination of Father M.'s parental rights was in Tavarius's best interest. Costs of this appeal are assessed equally against the appellant, Darius M., and the appellee, Tennessee Department of Children's Services, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE